```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
UNITED STATES OF AMERICA            :
                                    :       00 Cr. 1118 (JSR)
        -v-                         :
                                    :       MEMORANDUM ORDER
JOSEPH BRIDESON,                    :
                                    :
        Defendant.                  :
------------------------------------x
```

JED S. RAKOFF, U.S.D.J.

Defendant Joseph Brideson, who is currently serving a life sentence for the murder of Joseph Conigliaro, now moves for post-conviction disclosure of exculpatory information that he alleges the Government withheld at the time of his trial, in violation of the Government's obligations under Brady v. Maryland, 373 U.S. 83 (1963). For the reasons explained below, the motion is denied.

To summarize briefly the facts relevant to Brideson's motion, the Government alleged at trial that Brideson, Americo Massa, Thomas DiTorra, and Martin Lewis, who worked for the Decavalcante organized crime family, conspired to kill Conigliaro, an associate of the family. See Report and Recommendation dated Aug. 13, 2007 ("R&R") 1, 5, ECF No. 662. Specifically, the Government alleged that Massa offered Lewis $10,000 to kill Conigliaro and offered Brideson $250-a-week to assist in the murder plot, and, in furtherance thereof, Brideson then provided a .25 caliber handgun and silencer to Lewis. Id. at 5. The Government further alleged that on January 23, 1998, Lewis shot Conigliaro several times, and though Conigliaro managed

1

to drive away from the scene of the shooting and eventually made it to a hospital, he later died on the operating table. Id.

On December 19, 2002, following a two-week trial before Judge Mukasey, a jury found Brideson guilty of, among several other crimes, the murder of Conigliaro in aid of racketeering, and thereafter Brideson was sentenced to the statutorily mandated term of life imprisonment for that offense.[1] The Second Circuit denied Brideson's direct appeal of his conviction. United States v. Riggi, 117 Fed. App'x 142 (2d Cir. 2004). Thereafter, Brideson's first habeas petition, primarily raising the issue of ineffective assistance of counsel, was likewise denied. Order, Brideson v. United States, No. 06-cv-6044 (S.D.N.Y. Mar. 3, 2008) (adopting R&R), ECF No. 8. More recently, the Second Circuit also denied Brideson's request for leave to file a successive habeas petition. Order, Brideson v. United States, No. 13-4228 (2d Cir. Apr. 14, 2014).

Counsel for Brideson continued to investigate the case and, on January 19, 2016, sent a letter to the Government requesting the production of undisclosed Brady evidence. After the Government declined to produce the information requested, Brideson filed the instant motion to compel disclosure.

---

[1] Brideson also received concurrent terms of 120 months for conspiracy to murder in aid of racketeering and 240 months for conspiracy to make and collect extortionate extensions of credit, as well as a consecutive term of 60 months for the use of a firearm in connection with Conigliaro's murder.

Brady requires a prosecutor "to disclose material exculpatory evidence to the defendant before trial." Dist. Attorney's Office for the Third Judicial Dist. v. Osborne, 557 U.S. 52, 68 (2009). "In order to establish a Brady violation, a defendant must show, inter alia, (1) that the government failed to disclose favorable evidence, and (2) that the evidence it 'suppressed' was material." United States v. Payne, 63 F.3d 1200, 1208 (2d Cir. 1995). "Evidence is favorable to the accused if it either 'tends to show that the accused is not guilty' or 'impeaches a government witness.'" United States v. Jackson, 345 F.3d 59, 71 (2d Cir. 2003) (quoting United States v. Gil, 297 F.3d 93, 101 (2d Cir. 2002)). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Payne, 63 F.3d at 1209 (quoting United States v. Bagley, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.)). A "reasonable probability," in turn, is "a probability sufficient to undermine confidence in the outcome." Id. (quoting Bagley, 473 U.S. at 682 (opinion of Blackmun, J.)).

Brideson asserts that the Government failed to turn over exculpatory evidence regarding four subjects and must now do so in order to comply with its obligations under Brady. However, for each subject, he either fails to provide any basis for believing such evidence exists or fails to show that such evidence is material.

First, Brideson claims that the Government possessed evidence that another individual, Luis Grullon, who was previously involved

3

in narcotics trafficking with Conigliaro, was in fact responsible for Conigliaro's murder. Before trial, the Government provided Brideson's trial counsel with a letter noting that Joseph George Ray, who was at one time incarcerated with Grullon, claimed that Grullon told him that Grullon had shot and killed someone in a wheelchair. Mem. of Law in Support of Mr. Brideson's Mot. Seeking Post-Conviction Disclosure of Brady Evidence ("Def. Br.") Ex. 6, ECF No. 785. Given Grullon's previous dealings with Conigliaro and the fact that Conigliaro used a wheelchair, the Government surmised that Grullon's alleged statement referred to Conigliaro, and it conveyed as much in the letter. Id. The Government also noted, though, that Grullon was incarcerated at the time of Conigliaro's murder. Id.

Based on his counsel's interview with Ray, Brideson now asserts that Ray not only told the Government that Grullon admitted to Conigliaro's murder but also provided the Government with a recording in which Grullon's wife referenced Grullon's killing of Conigliaro. Def. Br. 13-14; Reply Mem. ("Def. Reply") Ex. 1 at 1-2, ECF No. 790.[2] The Government represents that it has searched its case files for such a recording and has found nothing. Government's Mem. in Opp. to Def.'s Mot. Seeking Post-Conviction Disclosure of Brady Evidence ("Gov't Opp.") 4 n.4, ECF No. 788. Moreover, even assuming

---

[2] Brideson does not submit any sworn statement from Ray attesting to the existence of the recording. In fact, his counsel's memorialization of the interview with Ray concludes with a notation indicating that Ray would submit a sworn statement, but none is included with Brideson's submissions. Def. Reply Ex. 1 at 2-3.

4

arguendo that the Government once possessed and failed to produce the recording, Ray's wife's alleged reference thereon would be hearsay (probably double or triple hearsay) and plainly inadmissible. To be sure, inadmissible evidence may constitute Brady material, but nonetheless "[o]ne consideration that bears on Brady materiality is admissibility." Gil, 297 F.3d at 104. In particular, if the evidence itself is not admissible, in order to be material it must "lead to admissible evidence" or "be an effective tool in disciplining witnesses during cross-examination by refreshment of recollection or otherwise." Id. The latter function does not apply, since neither Ray, Grullon, nor Grullon's wife testified at Brideson's trial. To the extent the recording could lead to admissible evidence in the form of testimony by Grullon or Grullon's wife, there is no reason to think that Brideson did not already have the opportunity to pursue such evidence upon learning from the Government that, according to Ray, Grullon had admitted to the murder. Thus, had Brideson received the recording, there is no reason to believe that "the result of the proceeding would have been different." Payne, 63 F.3d at 1209 (quotation omitted).

Grullon's incarceration at the time of Conigliaro's murder further demonstrates that the evidence Brideson seeks is not material. In his motion, Brideson contends that Grullon was not actually incarcerated at the time of Conigliaro's murder. In support of this contention, Brideson's counsel submits his notes from a conversation with an employee at the Federal Bureau of Prisons

5

("BOP"), who, he says, informed him that Grullon was not in federal custody between October 23, 1997 and November 5, 1999. Def. Reply Ex. 2. However, this assertion is squarely contradicted by a record from the BOP, which shows that Grullon was in continuous federal custody at the Metropolitan Correctional Center in New York from November 7, 1997 to September 2, 1998, a period encompassing January 23, 1998, the date of the murder. Gov't Opp. Ex. 1. Brideson argues that this record is not dispositive because Grullon could have been removed from custody for a court appearance or some other reason without such movement being recorded, and because, even if Grullon were incarcerated at the time, he nonetheless could have orchestrated Conigliaro's murder. Def. Reply 2-3. These assertions strain credulity, and Brideson has provided no credible ground to support them. Accordingly, Brideson has not demonstrated that the Government's disclosure of only Ray's statement regarding Grullon was insufficient to satisfy its obligations under Brady.

Second, Brideson claims that he is entitled to receive six files compiled by the Drug Enforcement Administration ("DEA") regarding Conigliaro's narcotics trafficking because they may contain evidence of other potential perpetrators of, and motives for, Conigliaro's murder. Through a request pursuant to the Freedom of Information Act ("FOIA"), Brideson's counsel obtained one such file, which contained a report, dated May 17, 1999, indicating that the Federal Bureau of Investigation ("FBI") was "currently utilizing information contained in this case file to investigate

6

[Conigliaro's] homicide." Def. Br. Ex. 4. Brideson does not point to any suspects identified in the file he obtained, but he argues that the fact that the files were used by law enforcement to investigate Conigliaro's murder suggests that they contain information that would be useful to the defense in conducting its own investigation. Def. Reply 2.

The Government interprets this as simply a component of the above theory -- that Grullon killed Conigliaro because of a dispute over narcotics -- and therefore, since Grullon was not involved in Congiliaro's murder, information relating to Conigliaro's drug trafficking would not tend to exculpate Brideson. Gov't Opp. 2-4. In the event that the reason for obtaining the DEA files is not vitiated by the failure of the Grullon theory (i.e., if Brideson seeks evidence that someone besides Grullon killed Conigliaro because of a dispute over narcotics), the Government represents that it exhaustively reviewed the five remaining files[3] and determined that there was no Brady material therein. Gov't Opp. 4 n.4. Rather, it states, the files contained mostly generic reports about controlled purchases of narcotics from Conigliaro, the vast majority of which were compiled before Conigliaro's death. Id.

The Court notes that the Government represents that it undertook this review, and the results thereof, in its brief, rather than attesting to those facts in a sworn statement. This is a sloppy

---

[3] The Government represents that one of the six files was destroyed in 2007 in the ordinary course of business. Gov't Opp. 4 n.4.

7

practice, as is defense counsel's similar failings, see, e.g., footnote 2 supra. But, more importantly, Brideson does not provide any documentary evidence or a sworn statement indicating that the DEA files contain exculpatory information. The fact that law enforcement agencies investigated the murder of the victim, without more, does not provide a basis to infer the files in question contain exculpatory material, and "mere speculation that exculpatory evidence was withheld is not sufficient under Brady." Mallet v. Miller, 432 F. Supp. 2d 366, 377 (S.D.N.Y. 2006); cf. Strickler v. Greene, 527 U.S. 263, 286 (1999) ("Mere speculation that some exculpatory material may have been withheld is unlikely to establish good cause for a discovery request on collateral review."). Thus, Brideson has not shown that there exists any evidence favorable to him in the DEA files that he seeks. Moreover, even if there were, as Brideson postulates, information in those files providing a motive for someone else to kill Conigliaro, it is unlikely that such information would be material because the mere existence of such motives would not necessarily "undermine confidence in the outcome" of the case, Payne, 63 F.3d at 1209 (quotation omitted), given the substantial other evidence directly pointing to Brideson's role in the murder, see, e.g., Def. Br. Ex. 9 at 1052-53 (trial testimony describing Brideson providing the gun used in the murder).

Third, Brideson claims that he should have received information that the Government gleaned from Massa, a non-testifying cooperator, because some of Massa's statements contradicted the Government's

theory at trial that Brideson provided the gun that was used to kill Conigliaro. According to Brideson, the Government, in its memorandum in opposition to Massa's post-conviction challenge to Massa's sentence, asserted that Massa "had admitted under oath to 'obtaining and transferring a .25 caliber handgun to Lewis in order to carry out the execution on Conigliaro,' and at other times prior to his admission of guilt, lied to the FBI 'regarding his role and Lewis'[s] role in the murder of Conigliaro.'" Def. Br. 15 (quoting id. Ex. 7 at 3).

    This, however, is not an accurate portrayal of the record. Rather, Brideson selectively quotes and thus mischaracterizes the Government's memorandum, which states that Massa "*assisted in* obtaining and transferring" the murder weapon, an assertion that is entirely consistent with Brideson physically providing the gun to Lewis. Def. Br. Ex. 7 at 3 (emphasis added). The Government's memorandum also indicates that Massa "attempted to cover up his crimes by initially lying to the police regarding his own role and Lewis'[s] role in the murder of Conigliaro, lies which he continue[d] to tell the FBI over the next year." Id. But this is consistent with the Government's disclosure, at the time of trial, that "during a number of interviews with law enforcement officers prior to his April 2001 arrest, Americo 'Mike' Massa repeatedly denied any involvement in the murder of Joseph Conigliaro." Def. Br. Ex. 8.

Brideson further contends that Massa's statements during his plea allocution contradicted the Government's theory as well. Def. Reply 4. But, even assuming arguendo that is so, the Government represents that it provided Massa's plea minutes to the defense before trial, Gov't Opp. 5 n.5, and Brideson does not dispute this representation. Brideson has therefore not shown that the Government failed to disclose statements by Massa that exculpate him by contradicting the Government's theory at trial.[4]

Fourth, and finally, Brideson claims that the Government knew or should have known of, but failed to disclose, evidence that the surgeon who treated Conigliaro before he died had a history of malpractice and was barred from medical practice in the time between Conigliaro's death and Brideson's trial. Def. Br. 16; Def. Reply 5. At trial, Brideson sought to advance the theory that Conigliaro died, not because of the gunshot wounds that he sustained, but rather as a result of medical malpractice. R&R 4-5, 8-10. However, the trial court declined to instruct the jury on that theory because Brideson failed to proffer sufficient evidence that the gunshot wounds were not a contributing cause of Conigliaro's death, i.e., that medical malpractice was the sole cause, which would be required for Brideson to prevail on that theory. R&R 11; see New York v. Griffin, 80 N.Y.2d 723, 727, 610 N.E.2d 367, 594 N.Y.S.2d 694 (1993)

---

[4] Brideson also alleges in passing that there exist wire recordings of conversations between DiTorra and Brideson containing exculpatory information, but he provides no basis for this assertion. Def. Br. 14 n.14.

("The test for relief from criminal responsibility for a death . . . [is] whether the death can be attributed solely to the negligent medical treatment."). That ruling was upheld on appeal. See Riggi, 117 Fed. App'x at 144 ("[A]s to Brideson's 'intervening cause' argument, there was no error, much less plain error, in the district court's instruction to the jury that there was no dispute as to Conigliaro's cause of death."). It is therefore clear that evidence of the surgeon's history of malpractice is not material: indeed, even the clearest proof that the surgeon who operated on Conigliaro committed medical malpractice would not alter the outcome of the case because it would do nothing to change Brideson's inability to show that Conigliaro died solely as a result of malpractice.

Accordingly, for the foregoing reasons, Brideson's motion is denied.

SO ORDERED.

Dated:   New York, NY
         June 26, 2017

JED S. RAKOFF, U.S.D.J.

11